IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 5, 2024

## IN RE EMMELINE C.

**Appeal from the Circuit Court for Davidson County**
**No. 23A28          Stanley A. Kweller, Judge**

_____

**No. M2024-00567-COA-R3-PT**

_____

In this case involving termination of the mother's parental rights to her daughter, the trial court found that three statutory grounds for termination had been proven by clear and convincing evidence. The trial court further found that clear and convincing evidence demonstrated that termination of the mother's parental rights was in the child's best interest. The mother has appealed. Discerning no reversible error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which ANDY D. BENNETT and KENNY ARMSTRONG, JJ., joined.

Nick Perenich, Nashville, Tennessee, for the appellant, Kelley C.[1]

## OPINION

### I. Factual and Procedural Background

On May 16, 2023, the petitioners, Cary R. and Jennifer R. ("Petitioners"), filed a petition for termination of parental rights and adoption concerning the minor child, Emmeline C. ("the Child"), in the Davidson County Fourth Circuit Court ("trial court"). Petitioners named the Child's mother, Kelley C. ("Mother"), as the sole respondent, noting that the Child's father was deceased. Petitioners explained that in November 2020, they had obtained guardianship concerning the Child, who was sixteen years of age at the time of the petition's filing.

---

[1] The appellees have not filed a brief or otherwise participated in this appeal.

Petitioners averred that Mother had been convicted of murdering the Child's father and remained incarcerated for that crime. Petitioners therefore relied on the statutory ground for termination found at Tennessee Code Annotated § 36-1-113(g)(7)(A) (applicable when the parent has been "convicted of first degree or second degree murder of the child's other parent"). Petitioners also relied on the statutory grounds of abandonment through wanton disregard for the Child's welfare, pursuant to Tennessee Code Annotated §§ 36-1-102 and -113(g)(1), and failure to manifest an ability and willingness to personally assume legal and physical custody of or financial responsibility for the Child, pursuant to Tennessee Code Annotated § 36-1-113(g)(14). Petitioners averred that termination of Mother's parental rights was in the Child's best interest.

In their petition, Petitioners explained that the Child held an interest in certain property that was under the control and supervision of the Davidson County Probate Court and for which a financial guardian had been appointed. Petitioners stated that they were financially able to provide for the Child. A copy of the trust and guardianship documents were attached to the petition.

Mother filed a *pro se* response to the petition, wherein she averred that neither termination of her parental rights nor Petitioners' adoption of the Child was in the Child's best interest because the Child was almost an adult. Mother requested that the trial court appoint counsel to represent her and filed an affidavit of indigency. The trial court appointed counsel to represent Mother and a guardian *ad litem* for the Child. Mother subsequently filed an answer to the termination petition through her appointed counsel.

On February 28, 2024, before the hearing on the termination petition commenced, Mother filed a motion to recuse the trial court judge. Mother complained that upon the filing of her witness list, Petitioners had objected to one of the listed witnesses, stating that such witness would be "triggering" to the Child and asking that he be kept out of the Child's presence. Mother claimed that Petitioners' counsel had sent an email stating these complaints to the special master, thereby giving the judge knowledge about a witness that he would not otherwise have had. The trial court promptly entered an order denying the motion, stating that the court was unaware of the contents of the email. The court also found that Mother's motion did not meet the requirements of Tennessee Supreme Court Rule 10B.

The trial court then conducted a bench trial on February 28, 2024, concerning the termination petition. The court heard testimony from Petitioners, the Child, and Mother (via Zoom). Petitioners testified that the Child had come to live with them when she was approximately thirteen years of age and had resided with them continuously since that time. Petitioners articulated their desire to adopt the Child, communicated their great love for her, and described the close bond that they and their children enjoyed with the Child.

Jennifer R. ("Foster Mother") testified that the Child had suffered from a great deal of anxiety when she first came to reside with Petitioners and needed control and order to hold her anxiety in check. According to Foster Mother, the Child also suffered from unaddressed learning disabilities, including problems with her short-term memory. During her testimony, Foster Mother described the steps she and her family had taken to help the Child with those issues.

Foster Mother explained that the Child was now a "straight A" student in school, whereas before her grades were much lower. The Child had also joined a competitive cheer team, which she seemed to greatly enjoy. Moreover, the Child had expressed interest in attending college and continuing to cheer at that level. According to Foster Mother, her two children interacted well with the Child. She stated that "it has been like she's been there her whole life." Foster Mother described the close bonds between her family and the Child, and she opined that changing caregivers would be devastating for the Child. Foster Mother explained: "Especially with the amount of loss that [the Child has] had in her life . . . I could see that as being pretty detrimental to her well-being."

Foster Mother related that the Child maintained no relationship with Mother and explained that the Child had suffered much upset and embarrassment based on the publicity surrounding her father's murder. According to Foster Mother, the Child had been subjected to unkind remarks from other people regarding the incident. Foster Mother also reported that Mother had never reached out to Foster Mother or her husband and had not provided any financial support. Foster Mother stated that she and her husband wished to adopt the Child once Mother's parental rights were terminated.

Cary R. ("Foster Father") echoed Foster Mother's testimony, relating that the Child was a "great kid" who made "all A's" and who was artistic, creative, and bright. Foster Father articulated that the Child was part of their family and that she referred to Petitioners as "mom" and "dad." Foster Father further stated that he considered the Child to be his child, the same as his biological children. He reported that Petitioners were able to financially provide for the Child's needs and wished to adopt her.

The Child likewise testified that she enjoyed a close and loving bond with Petitioners and their children, describing her current situation as the first time she had experienced such a family dynamic. According to the Child, she was sent to live with her paternal aunt and uncle following her father's death, and she experienced great difficulties while living with them, including her aunt's struggle with addiction. Following her aunt's death, the Child began to reside with Petitioners. The Child expressed that she felt safe and respected in Petitioners' home and articulated her desire to be adopted by Petitioners. She also communicated her wish to have no contact with Mother, with whom she could not remember having resided. The Child stated that she had no relationship with Mother and that being removed from Petitioners' care would be devastating.

The Child further related that during her stay with Petitioners, she had been able to enjoy "normal" family activities for the first time, such as having dinner together, taking family vacations, and "hanging out." She described Petitioners' daughter as her "best friend" and added that she enjoyed a close sibling relationship with their son. The Child stated that she had been able to participate in activities she enjoyed, like cheering, and felt that for the first time, she had "a voice." The Child reported that although she had no relationship with her eldest biological brother, she did maintain contact with her other biological brother, who was "struggling with his own stuff." According to the Child, she desired no contact with any other members of her biological family. She simply wanted to experience a normal family life, which she felt would be the result of her adoption by Petitioners.

Mother, who maintained her innocence concerning the death of the Child's father, claimed that she had tried to contact the Child during the years the Child resided with the paternal aunt and uncle but that such efforts were rebuffed by those guardians. Mother proffered that her concern with the Child's adoption by Petitioners related to the "timing" because the Child was almost an adult and had a trust fund worth $2.5 million. Foster Father was recalled to the stand, however, and testified that aside from approximately $2,000 the trustee had provided to Petitioners when the Child first came to live with them, which was used to procure testing and tutoring for the Child concerning some learning delays, they had sought no further disbursements from the trust for the Child's care.

On March 19, 2024, the trial court entered an order terminating Mother's parental rights. The court found that Petitioners had proven all three statutory grounds for termination by clear and convincing evidence. After reviewing the twenty statutory best interest factors contained in Tennessee Code Annotated § 36-1-113(i)(1), the court also determined that Petitioners had proven by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest. Accordingly, the court terminated Mother's parental rights to the Child. Mother timely appealed.

## II. Issues Presented

Mother presents the following issues for this Court's review, which we have restated slightly:

1. Whether the trial court erred by finding that statutory grounds existed to terminate Mother's parental rights to the Child.

2. Whether the trial court erred by finding that termination of Mother's parental rights was in the Child's best interest.

- 4 -

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings.  *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness.  *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002).  It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)).  As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)].  Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable").  In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769.  This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).  "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or

substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV.  Statutory Grounds for Termination of Mother's Parental Rights

Tennessee Code Annotated § 36-1-113 (West July 1, 2022, to current)[2] lists the statutory requirements for termination of parental rights, providing in relevant part:

> (a)  The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

> * * *

> (c)  Termination of parental or guardianship rights must be based upon:

---

[2] Unless otherwise noted, throughout this Opinion all citations to any section within Tennessee Code Annotated §§ 36-1-113 and 36-1-102 shall be made in reference to the version that was effective on the date the termination petition was filed and not to any other version of the statute. *See, e.g.*, *In re Zakary O.*, No. E2022-01062-COA-R3-PT, 2023 WL 5215385, at *4, n.6 (Tenn. Ct. App. Aug. 5, 2023). In some instances, such as this one, the subsection that was in effect at that time has not changed and therefore remains current.

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
>
> (2) That termination of the parent's or guardian's rights is in the best interests of the children.

In its final order, the trial court found that clear and convincing evidence supported the following grounds for termination of Mother's parental rights: (1) abandonment by Mother's exhibition of wanton disregard for the Child's welfare prior to Mother's incarceration, (2) Mother's conviction of first degree murder of the Child's other parent, and (3) Mother's failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. We will address each ground in turn.

### A. Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (West July 1, 2022, to current), provides in relevant part:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
>
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred[.]

The version of Tennessee Code Annotated § 36-1-102(1)(A) (West May 4, 2023, to June 20, 2023) in effect when the termination Petition was filed provided the following definition of abandonment as pertinent to the first ground for termination in the instant case:

> For purposes of terminating the . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:
>
> (iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been

incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

* * *

    (c)    With knowledge of the existence of the . . . child, engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child[.]

With regard to this termination ground, this Court has previously explained:

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Taxonomy of Children's Rights*, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005) (footnote omitted). Furthermore, this Court has concluded that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

At the beginning of trial, Petitioners' counsel introduced exhibits demonstrating that on April 29, 2010, Mother had been convicted of the first-degree, premeditated murder of the Child's father. As a result, Mother had been sentenced to life in prison. The record demonstrates that the Child's father died on June 23, 2008, when the Child was approximately eighteen months old. The trial court found that this proof constituted clear

and convincing evidence that Mother acted with wanton disregard for the Child's welfare prior to Mother's incarceration. We agree.

This Court has previously held that abandonment by wanton disregard can be established when a parent acts with violence toward the other parent and is incarcerated as a result. *See In re Isabella W.*, No. E2019-01346-COA-R3-PT, 2020 WL 2070392, at *10 (Tenn. Ct. App. Apr. 29, 2020) (finding clear and convincing evidence of wanton disregard prior to incarceration when the father had, *inter alia*, pushed "mother to the ground, threatened to kill her, attempted to strangle her, and held a pocket knife against her neck in their home."); *In re R.S.*, No. E2018-00270-COA-R3-PT, 2018 WL 3549765, at *5 (Tenn. Ct. App. July 24, 2018) ("While Father's rape of mother would be sufficient to conclude that he exhibited a wanton disregard for the welfare of the Children prior to his incarceration, the record reveals that Father also perpetrated physical abuse against mother by choking her and threatening her with baseball bats and other weapons."). In this case, the proof was undisputed that Mother had been convicted of first-degree murder by strangulation of the Child's father when the Child was eighteen months old. Accordingly, the evidence does not preponderate against the trial court's determination that the statutory ground of abandonment by wanton disregard had been proven by clear and convincing evidence.

### B. Conviction of First-Degree or Second-Degree Murder of the Other Parent

Tennessee Code Annotated § 36-1-113(g)(7) (West July 1, 2022, to current) provides as an additional ground for termination of parental rights:

The parent has been:

(A)    Convicted of first degree or second degree murder of the child's other parent[.]

For the same reasons as stated above, we conclude that the evidence does not preponderate against the trial court's determination that this statutory ground was also proven by clear and convincing evidence. We reiterate that the proof was undisputed that Mother had been convicted of first-degree, premeditated murder of the Child's father and had been sentenced to life in prison. Accordingly, this ground was conclusively established. *See, e.g.*, *In re Taylor A.B.*, No. W2013-02312-COA-R3-PT, 2014 WL 3778749, at *5 (Tenn. Ct. App. July 31, 2014) (finding that the ground set forth in Tennessee Code Annotated § 36-1-113(g)(7) had been established by clear and convincing evidence when proof was presented that the father had been convicted of first-degree murder of the children's mother).

## C. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Child

The trial court further found, by clear and convincing evidence, that Mother had failed to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child. Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (West July 1, 2022, to current) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, Petitioners were required to show by clear and convincing evidence that (1) Mother failed to manifest either an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

After considering the proof as to this ground, the trial court concluded:

> [Mother] is serving a life sentence. Pursuant to Tenn. Code Ann. § 36-1-113(g)(14) the Court finds that [Mother] has failed to manifest, by act or omission, the ability and willingness to personally assume the legal, physical, or financial responsibilities for the child and that placing the child with [Mother] in any circumstance, particularly while she is in prison, poses a risk of substantial harm for the physical or psychological well-being of the child.

The evidence in the record supports the trial court's findings and conclusions. Again, the proof conclusively established that Mother had been convicted of murder and was serving a life sentence at the time of the termination trial. As such, she was clearly unable to assume custody of or financial responsibility for the Child.

In further support of this statutory ground, Petitioners were required to prove that returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to

- 10 -

precise definition because of the variability of human conduct.  However, the use of the modifier "substantial" indicates two things.  First, it connotes a real hazard or danger that is not minor, trivial, or insignificant.  Second, it indicates that the harm must be more than a theoretical possibility.  While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).  The trial court also found that the "substantial harm" prong relative to this ground had been proven by clear and convincing evidence. Upon our review, we agree.

The evidence established that Mother was serving a life sentence in prison.  Accordingly, there can be no question that returning the Child to her custody would pose a risk of substantial harm to the Child's welfare.  Additionally, this Court has previously acknowledged that removing children from foster families with whom they have bonded over time "would pose a risk of substantial harm to the physical or psychological welfare of the [child]."  *See In re F.N.M.*, No. M2015-00519-COA-R3-PT, 2016 WL 3126077, at *12 (Tenn. Ct. App. Apr. 11, 2016) (quoting *State v. C.H.H.*, No. E2001-021-7-COA-R3-CV, 2002, WL 1021667, at *8-9, (Tenn. Ct. App. May 21, 2002)).

In addition to the evidence presented regarding Mother's situation, the trial court considered evidence regarding the loving relationship between Petitioners and the Child.  Petitioners expressed an unwavering desire to adopt the Child, and the Child likewise expressed her desire to be adopted by them.  The Child, who was seventeen years old[3] at the time of trial, testified that she thought of Petitioners as her parents and enjoyed a close bond with them and their children.  The Child expressed her desire to remain in Petitioners' home, stating that with them, she felt safe and had enjoyed a real "family dynamic" for the first time in her life.  The Child further stressed that if she had to leave Petitioners' home, she would be devastated.

Based on the proof presented, we conclude that the evidence does not preponderate against the trial court's determination, by clear and convincing evidence, that (1) Mother failed to manifest an ability or willingness to assume custody of or financial responsibility for the Child and (2) returning the Child to Mother's custody would pose a risk of substantial harm to the Child's welfare.  We therefore affirm the trial court's reliance in its termination order on the ground of failure to manifest an ability and willingness to assume legal and physical custody of or financial responsibility for the Child.

---

[3] We recognize that the Child has attained the age of majority during the pendency of this appeal.  However, we find that this termination action still presents a justiciable controversy due to its entwinement with Petitioners' adoption request and other "collateral consequences."  *See In re Chance B.*, No. M2023-00279-COA-R3-PT, 2024 WL 764015, at *7 (Tenn. Ct. App. Feb. 26, 2024); *see also In re Jeremy C.*, No. M2020-00803-COA-R3-PT, 2021 WL 754604, at *6 n.5 (Tenn. Ct. App. Feb. 26, 2021).

## V. Best Interest of the Child

When, as here, a parent has been deemed unfit by establishment of at least one statutory ground for termination of parental rights, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *See In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i)(1) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i)(1) (West July 1, 2022, to current) lists the following factors for consideration:

(A)   The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)   The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)   Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)   Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)   Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)   Whether the child is fearful of living in the parent's home;

(G)     Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)     Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)     Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)     Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)     Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)     Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)     Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)     Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)     Whether the parent has ever provided safe and stable care for the child or any other child;

(P)     Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)     Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)     Whether the physical environment of the parent's home is healthy and safe for the child;

(S)     Whether the parent has consistently provided more than token financial support for the child; and

(T)     Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

The statute further provides: "When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(g)(i)(2).

As our Supreme Court has instructed regarding the best interest analysis:

These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

In re Gabriella D., 531 S.W.3d 662, 681-82 (Tenn. 2017).

In its final order, the trial court considered each of the twenty best interest factors and determined that most of them weighed in favor of terminating Mother's parental rights. Upon our thorough review of the evidence, we determine that the trial court's findings regarding the best interest factors are supported by a preponderance of the evidence.

Concerning factor (A), relative to the Child's "critical need for stability and continuity of placement," the trial court determined that this factor weighed in favor of termination because the Child "testified that the one thing she has wanted her whole life is stability" and that Mother's acts had deprived the Child of such stability. The trial court found the Child to be "bright, engaging, smart, and articulate" and found that the Child had testified that she had experienced stability in Petitioners' home. The evidence supports these findings. In addition, Petitioners expressed that the Child had integrated well into their family and that they and their children enjoyed a close bond with her. Petitioners voiced their interest in adopting the Child and making her a permanent part of their family, and the Child echoed that desire. For these reasons, we agree with the trial court that factor (A) weighs in favor of termination. For the same reasons, we determine that the evidence preponderates in favor of termination as to factor (B), which relates to the effect a "change of caretakers and physical environment" would have on the Child's overall well-being. Both the Child and Petitioners testified that the Child would be devastated if she had to leave Petitioners' home.

Regarding factor (C), concerning whether the parent has demonstrated continuity and stability in meeting the Child's needs, the trial court found that Mother had "failed to demonstrate any continuity and stability in meeting the child's . . . needs" because she had been in prison since the Child was very young and had provided nothing for the Child since her incarceration. Accordingly, the trial court determined that this factor weighed in favor of termination of Mother's parental rights. Upon review, we find that the evidence preponderates in favor of the trial court's findings regarding this factor.

As to factor (D), the trial court determined that there was a dearth of evidence demonstrating any attachment between Mother and the Child. The court noted the Child's testimony that she had "no attachment to [Mother]" and found her testimony to be "extraordinarily credible." The court also found that Mother had made no effort to form an attachment with the Child. Regarding the related factor (E), concerning whether the parent has maintained regular visitation or other contact with the child to cultivate a positive relationship with the child, the court found that there had been no visitation or other contact between Mother and the Child, except for a card Mother sent to the Child when the Child was approximately eight years old. Accordingly, we agree with the trial court that both factors (D) and (E) weigh in favor of termination of Mother's parental rights.

Factors (F) and (G) relate to the Child's previous experiences in the parent's home and any trauma resulting from those experiences. Here, the trial court found that factor (F), regarding whether the child fears living in the parent's home, weighed in favor of termination because Mother was in prison and "prison is not a safe, stable environment for a 17-year-old young lady." Although we agree with the trial court on that point, we note that the Child testified that she did not remember ever having lived in Mother's home and expressed no fear of it. With regard to factor (G)—whether the parent, the parent's home, or others living in the parent's home trigger or exacerbate traumatic experiences—the trial court expressed doubt concerning the applicability of this factor. However, the court found that to the extent this factor weighed in favor of termination, it carried "little weight" because (1) the Child had almost no recollection of Mother and (2) Petitioners had presented no evidence that the Child's trauma would be triggered by living with Mother.

This Court has recently examined the applicability of factors (F) and (G) when the child has never lived in the parent's home or when no evidence concerning the factors has been presented at trial. *See In re Colten B.*, No. E2024-00653-COA-R3-PT, 2025 WL 252663, at *9-10 (Tenn. Ct. App. Jan. 21, 2025). The mother in *Colten* conceded that the child had not had contact with her since he was removed from her custody shortly after birth, but she argued that the trial court had erred in finding factor (F) to be inapplicable because the fact that the child did not recognize her would mean that he was not fearful of living in her home. *Id.* at *9. The *Colten* Court noted that this Court had affirmed the trial court's finding that the two factors were neutral in *In re Bentley R.*, No. W2023-01665-COA-R3-PT, 2024 WL 3443817, at *11 (Tenn. Ct. App. July 17, 2024), when the mother

- 16 -

had argued that factors (F) and (G) "should have weighed in her favor in the absence of proof that the child at issue was fearful." *Id.* (also citing *In re Azelea B.*, No. M2023-00656-COA-R3-PT, 2024 WL 657652, at \*23 (Tenn. Ct. App. Feb. 16, 2024); *In re Riley B.*, No. E2022-00684-COA-R3-PT, 2023 WL 3477216, at \*11 (Tenn. Ct. App. May 16, 2023)). Summarizing case law regarding factors (F) and (G) since the enactment of the current best interest factors, this Court explained:

> In another case, we deemed factor (F) "inapplicable" where a child had never lived in the parental home. *See In re Tayla R.*, No. M2024-00248-COA-R3-PT, 2024 WL 4950106, at \*21 (Tenn. Ct. App. Dec. 3, 2024) ("DCS concedes that factor (F), regarding a child's fear of living in the parental home, is inapplicable since the Child never lived in Mother and Legal Father's home. For their part, Foster Parents argue that factor (F) applies and weighs in favor of termination. We agree with DCS as to the inapplicability of factor (F)[.]"). We have deemed factor (F) inapplicable in many other cases as well. *See, e.g.*, *In re Lilah G.*, No. E2023-01425-COA-R3-PT, 2024 WL 3825077, at \*10 (Tenn. Ct. App. Aug. 15, 2024) (agreeing with the trial court that factor (F) did not apply because there was no proof regarding it presented at trial); *In re Elizabeth Y.*, 2024 WL 3738701, at \*15 (noting that the trial court "omitted any reference" to factor (F) presumably finding it inapplicable, and agreeing that it "would weigh neither for nor against termination" because the child never resided in the home); *In re Logan F.*, No. M2023-01280-COA-R3-PT, 2024 WL 3534932, at \*12 (Tenn. Ct. App. July 25, 2024) (finding factor (F) inapplicable where the court heard no testimony regarding whether the child would be fearful of living in the home); *In re Quentin G.*, 2024 WL 3324105, at \*7 (same); *In re Zoey O.*, No. E2022-00500-COA-R3-PT, 2023 WL 3222699, at \*14 (Tenn. Ct. App. May 3, 2023) ("The trial court also found that the factors set forth in Tennessee Code Annotated section 36-1-113(i)(1)(F) and (G) do not apply in the present case. The record supports these findings."); *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at \*23 (Tenn. Ct. App. Nov. 10, 2022) ("Like the juvenile court, we find that factors (F), (G), and (S) are inapplicable. There was only one incident at an in-person visit at Mother's home which resulted in Joseph becoming confused and upset. There was no evidence that Joseph would fear living in Mother's home[.]"); *but see In re Ethan W.*, No. E2024-00318-COA-R3-PT, 2024 WL 4600451, at \*19 (Tenn. Ct. App. Oct. 29, 2024) (concluding that factor (F) weighed against termination where there was no proof regarding that factor); *In re Freddy P.*, No. E2023-00042-COA-R3-PT, 2024 WL 660195, at \*12 (Tenn. Ct. App. Feb. 16, 2024) ("there was no proof as to whether the child was fearful of living in Mother's home, which weighs against termination"); *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at \*14 (Tenn. Ct.

App. Oct. 31, 2023) ("DCS's failure to submit sufficient proof as to a factor does not necessarily mean that the factor is inapplicable").

*In re Colten B.*, 2025 WL 252663, at *10. The *Colten* Court deemed factor (F) neutral in that case, but the Court also determined that because the mother had demonstrated no relationship at all with the child, any mislabeling of this single factor represented harmless error. *Id.* at *10.

In this case, we reiterate that the trial court found factor (F) to weigh in favor of termination and factor (G) to be inapplicable or to carry little weight. Given the lack of evidence presented concerning whether the Child was fearful of Mother's home or whether her trauma would be exacerbated by Mother or Mother's home, we determine that these factors should weigh against termination. *See In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076, at *14 (Tenn. Ct. App. Oct. 31, 2023) (determining that a factor in the best interest analysis that is "not proven to weigh in favor of termination . . . weighs against termination."). However, we agree with the *Colten* Court that whether these factors are considered "inapplicable, neutral, or even assuming arguendo that [they] should weigh against termination," *see In re Colten B.*, 2025 WL 252663, at *10, any mislabeling of these factors by the trial court will constitute harmless error if the overwhelming weight of the other factors militates in favor of terminating Mother's parental rights. *See id.*; *see also In re C.T.*, No. E2021-01336-COA-R3-PT, 2022 WL 2236147, at *11 (Tenn. Ct. App. June 22, 2022); *In re Erin N.*, No. E2021-00516-COA-R3-PT, 2022 WL 444284, at *27 (Tenn. Ct. App. Feb. 14, 2022). Accordingly, we proceed in our review of the statutory best interest factors to determine the collective result.

Regarding factor (H)—whether the child has created a healthy parental attachment with another person or persons in the absence of the parent—the trial court found that this factor weighed in favor of termination because the Child "had developed a close, loving, and caring relationship with Petitioners" and had "blossomed" in their care. The court also reiterated the Child's testimony that Petitioners had "made her feel part of something for the first time in her life, that she has a typical parent-child relationship with each of them[,] and that she wants them to adopt her to solidify that relationship." We agree with the court's further finding that the Child "is bonded to and has a healthy parental attachment to both" Petitioners. The Child testified that she considered Petitioners to be her parents and felt safe in their home. The evidence preponderates in favor of the trial court's findings as to factor (H).

The trial court determined that factor (I) weighed in favor of termination as well. The trial court found that the Child had "excellent" relationships with her foster siblings and that she considered Petitioners' daughter to be her "best friend" and was also close to Petitioners' son. The court made no finding regarding the Child's "access to information about the child's heritage." However, given the stigma attached to Mother's murder conviction and other issues concerning the Child's biological family, the Child testified

unequivocally that she had no desire to have a relationship with Mother or her eldest brother, although she did maintain contact with her other brother. Accordingly, the evidence preponderates in favor of the trial court's findings as to factor (I).

The trial court determined that factor (J) weighed in favor of termination inasmuch as Mother was incarcerated and was "going to be there for at least another thirty (30) years serving a life sentence." The court accordingly found that Mother "cannot make an adjustment of circumstances that would ever allow her to provide a safe home" for the Child. We agree. Mother could not demonstrate a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the Child to be with her due to her incarceration.

The trial court found that factor (K), concerning whether the parent had taken advantage of available programs or services, and factor (L), concerning whether the Tennessee Department of Children's Services ("DCS") had made reasonable efforts to assist the parent in making a lasting adjustment, did not apply in this matter. We agree. Mother had been incarcerated during the years that the Child had been in the care of others, and DCS had not been involved. The court also found that factor (M), concerning whether the parent had demonstrated a sense of urgency in addressing her circumstances, was also "probably not applicable" but that to the extent it was applicable, the factor would favor termination. Given Mother's lengthy incarceration, we determine factor (K) to be inapplicable.

With respect to Factor (N), regarding whether the parent or anyone residing in the parent's home had shown brutality or abuse toward the Child or any other child or adult, the trial court again questioned whether the factor was applicable because Mother did not have a home as contemplated by the factor. We determine, however, that due to Mother's conviction of a violent crime involving the Child's father, this factor is applicable and weighs in favor of termination.

Regarding factor (O)—whether the parent has ever provided safe and stable care for the child or any child—the trial court determined that Mother had not provided care for any child since 2008 and that no evidence was presented to show whether Mother had provided safe and stable care prior to that time. The court noted that the proof demonstrated that the Child's brothers "struggle[d] with their own problems" and that those problems "flow from the acts of [Mother] in 2008 when she strangled and killed their father and took both of their parents away from them." The court therefore found that this factor favored termination.

As to factor (P), there is no evidence in the record that Mother ever demonstrated any concern for the Child's basic and specific needs. The trial court found that Mother "does not know this child, she does not know what challenges this child faces, what educational needs the child has or what emotional and psychological support the child

required to help her overcome her trauma and be successful in life." Instead, Mother only expressed concern about the Child's trust fund and, as the trial court found, "could not understand the child's own testimony that what she wanted most in the world was to be part of a family." The court thus found that factor (P) also weighed in favor of termination. The evidence preponderates in favor of the trial court's findings as to these factors.

Regarding factor (Q)—whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and wherein the child can thrive—and factors (R) and (S)—relative to the physical environment of a parent's home and a parent's history of providing financial support—the trial court found that these factors weighed in favor of termination. Upon careful review of the evidence, we agree for the reasons articulated above. Regarding factor (T), relative to Mother's mental and emotional fitness to provide safe and stable care and supervision of the Child, there was little proof presented regarding Mother's mental and emotional state aside from the fact that she had been convicted of premeditated murder. The trial court also noted as proof of this factor Mother's "failure to grasp her child's most basic needs as evident from [Mother's] own testimony." The trial court therefore determined that this factor weighed in favor of termination. We conclude that the proof supports the trial court's determination. We particularly consider Mother's violent past, her lack of expressed remorse or empathy concerning the Child's situation, and her lack of understanding regarding the Child's wish to be part of a family.

Considering the entirety of the applicable factors, we conclude that the evidence weighs soundly in favor of terminating Mother's parental rights to the Child. We therefore affirm the trial court's finding by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment in all respects. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Mother's parental rights to the Child and collection of costs assessed below. Costs on appeal are assessed to the appellant, Kelley C.

s/ Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE